## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **MASCHINENFABRIK HERKULES GmbH & CO., KG,** | § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § § | **CIVIL ACTION NO. 5:20-CV-1173** |
| **ALTOS HORNOS DE MEXICO, S.A.B. DE C.V.,** | § § § § | |
| **Defendant.** | § § § | **JURY TRIAL DEMANDED** |

### PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

Plaintiff Maschinenfabrik Herkules GmbH & Co. KG, ("Herkules" or "Plaintiff") files its Original Complaint against Defendant Altos Hornos De Mexico, S.A.B. De C.V. ("AHMSA" or "Defendant") and, in support thereof, alleges the following:

### I.     PRELIMINARY STATEMENT

1.     This action arises out of AHMSA's failure to perform its obligations under a purchase agreement for one Herkules WS1100 Roll Grinder. Plaintiff brings this action to remedy the harm Defendant has caused to it through breach of contract, negligent misrepresentation, and fraud in the inducement.

2.     Defendant defaulted on its payment obligations under the purchase agreement. Since that time, Herkules has made good-faith efforts to find an amicable solution to this dispute. Defendant initially indicated a willingness to settle this

ORIGINAL COMPLAINT                                                                                      PAGE 1

matter but has since ceased communication. As such, despite Plaintiff's best efforts to resolve this without legal action, Plaintiff is compelled to seek this court's assistance in enforcing its rights under the purchase agreement.

## II.  PARTIES

3.   Herkules is a company organized and existing under the laws of Germany.  For purposes of this action only, it may be served through its counsel listed below.

4.   AHMSA is a company organized and existing under the laws of Mexico. It has not designated a registered agent for service of process and must be served subject to the strictures of the Hague Service Convention.

## III.  JURISDICTION AND VENUE

5.   This Court has personal jurisdiction over Defendant, as the parties contractually agreed to submit to the jurisdiction of this Court.

6.   This Court has subject matter jurisdiction over this action under 28 U.S.C. §1331 as to the causes of action arising under federal law and supplemental jurisdiction as to all other causes of action under §1367(a) because those causes of action form part of the same case or controversy as the federal causes of action under Article III of the United States Constitution.

7.   Venue is proper in this Court under 28 U.S.C. §1391(b)(3), as the parties contractually agreed to submit to the jurisdiction of this court and there is no district in which this action may otherwise be brought.

## IV.    BACKGROUND FACTS

8.    Plaintiff Herkules is a German company that was founded in 1911 in Siegen, Germany.  For over 100 years, Herkules has produced machine tools and equipment; it specializes in the production of roll machining, including specialized roll grinders and lathes. Plaintiff's machines can be used in a number of industries, including steel manufacturing, and Plaintiff has subsidiaries in various countries, including China, India, and the United States, to assist it in providing goods and services to companies in those regions.

9.    Defendant is a Mexican company that manufactures steel products using various industrial machinery, including the type of roll grinder in which Plaintiff specializes. Defendant is headquartered in Monclova, Coahulia, Mexico, and describes itself as one of the largest integrated steel producers in Mexico. Like Herkules, Defendant has subsidiaries in various other locations, including U.S. headquarters in San Antonio, Texas.

### A. The Initial Purchase Agreement

10.    On August 7, 2014, the parties entered an agreement ("Purchase Agreement" or "the agreement") whereby Plaintiff would sell, and Defendant would buy, one Herkules WS1100 Roll Grinder ("the equipment"). The parties agreed to a price of $3,701,250.00 to be paid by Defendant in parts over time as Plaintiff reached certain milestones.

11.    Specifically, the Purchase Agreement provided that 20% of the purchase price would be due in advance, within twenty days of the date of the agreement; 10%

would be due within seven days of Defendant's receipt and approval of the basic engineering plans of the equipment; 20% would be due within seven days of Defendant's receipt of notice of Plaintiff's readiness to start production; 30% would be due within fifteen days of Defendant's receipt of notice of Plaintiff's readiness to ship; 10% would be due within ten days of delivery; and 10% would be due after Defendant issued a Final Acceptance Certificate or after Plaintiff certified that the Final Acceptance Certificate could not be signed within six months after delivery due to reasons beyond Plaintiff's control.

12.     In addition to providing Defendant with the basic engineering plans of the equipment ("the Basic Engineering"), Plaintiff agreed to provide Defendant with additional technical specifications during the course of its performance of the contract ("the Detail Engineering").

13.      Both the Basic Engineering and the Detail Engineering contained information that was a valuable, special, and unique asset owned by Herkules.

14.     The information contained in the Basic Engineering and the Detail Engineering (collectively, "the information") provided independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

15.     At all times, Plaintiff has made reasonable efforts to ensure the information remained secret.

16.     The information constituted trade secrets that Plaintiff owned.

17.     Under the Purchase Agreement, Herkules provided Defendant with a perpetual, irrevocable, and royalty-free license to use any and all intellectual property and software incorporated into or related to the equipment. Herkules also granted Defendant a perpetual, irrevocable, and royalty-free license to use and make copies of all documentation and information supplied to Defendant under the agreement, including the information contained in the Basic Engineering and Detail Engineering. However, Defendant was only licensed to use the intellectual property and supplied information for the limited purposes of erecting, constructing, installing, maintaining, and/or operating the equipment that it was acquiring from Herkules under the Purchase Agreement. Section 6.1 of the Purchase Agreement specifically provided that Herkules would retain ownership of all intellectual property incorporated into or related to the Equipment.

18.     The Purchase Agreement also provided that it was to be construed under Texas law. Additionally, the parties agreed to submit to the jurisdiction of the courts located in San Antonio, Texas, USA and waived any other jurisdiction.

19.     The Purchase Agreement provided that Plaintiff would deliver the completed equipment to Ford City, Pennsylvania. At present, the machine has been completed and delivered to the designated location,

20.     The Purchase Agreement further provided that Defendant would acquire title and ownership of the equipment, or any portion thereof, as soon as full payment for that portion was received by Plaintiff.

21.     Under the Purchase Agreement, either party could suspend its performance obligations under the contract for a limited time due to an event of force majeure.

22.     Finally, both parties represented that they had "sufficient legal and economical capacity" to enter into the Purchase Agreement.

**B. The First Amendment to the Purchase Agreement**

23.     On November 10, 2014, the parties entered an agreement to amend the terms of the Purchase Agreement ("First Amended Agreement").

24.     The First Amended Agreement modified the equipment to be delivered under the Purchasing Agreement, increased the purchase price to $5,001,250.00, and required delivery of the equipment within 13.5 months of the effective date of the amendment.

25.     Additionally, the First Amended Agreement made the following changes to the payment schedule: 1) an advance payment of $740,250.00 was made due within 20 calendar days of the date of the Purchasing Agreement; and 2) an advance payment of $260,000.00 was to be made within 30 days of the date of the First Amended Agreement. The other provisions of the payment schedule were not amended.

26.     Pursuant to the terms of the Purchase Agreement and the First Amended Agreement Plaintiff supplied Defendant with documentation, including the Basic Engineering and the Detail Engineering.

27. Subsequent to the execution of the First Amended Agreement, Defendant made a temporary suspension of its performance obligations. Defendant represented that the circumstances of the Mexican steel market had changed, and it was possible that Defendant would become unable to perform its obligations. Plaintiff, believing Defendant's representations about the Mexican steel market, did not object to the temporary suspension.

## C. AHMSA's Bankruptcy and Restructuring

28. At the time of the negotiation and execution of the Purchase Agreement and First Amendment, unbeknownst to Herkules, Defendant was in the process of a complicated bankruptcy restructuring under Mexican law.

29. Defendant's bankruptcy proceeding was initiated in Mexico on May 24, 1999. Because the proceeding was highly complex, it continued for seventeen years. Only a month after AHMSA signed the First Amended Agreement, in December 2014, Defendant finally filed its plan of reorganization with the Mexican bankruptcy court. Yet Defendant hid this entire process from Herkules, did not reveal its upcoming reorganization plan, and did not tell Herkules that Defendant would face liquidation if the plan was not approved

30. Approximately a year and a half after the First Amended Agreement with Herkules was signed and the reorganization plan was presented to the Mexican court, on May 16, 2016, the Mexican court entered an order approving Defendant's payment plan and lifting the suspension of Defendant's payments to its creditors ("Lifting Order").

31.     Under the terms of the approved payment plan and the Lifting Order, and in accordance with Mexican law, Defendant was obligated to make all the payments due within three years of the date on which the Lifting Oder was entered. If Defendant failed to satisfy its obligations by May 16, 2019, it would be forced into liquidation.

32.     On August 9, 2016, the Mexican court's Lifting Order came into effect as a final, non-appealable order. Defendant was able to issue new shares and began making cash payments to certain creditors. Defendant was also permitted to file foreign recognition proceedings.

33.     On August 16, 2016, Defendant filed a Chapter 15 petition in the United States Bankruptcy Court for the District of Delaware seeking recognition in the United States of the May 16, 2016 Lifting Order.

34.     At no point did Defendant apprise Plaintiff of these proceedings or inform Plaintiff of its tenuous economic capacity. Indeed, Defendant explicitly represented to Plaintiff in the Purchasing Agreement that it had the "economical capacity" to perform its obligations. Defendant reaffirmed and ratified this representation by executing the First Amended Agreement.

**D. The Second Amendment to the Purchase Agreement**

35.     On August 24, 2016, only eight days after filing its Chapter 15 Petition in Delaware, Defendant withdrew its temporary suspension of its obligations under the Purchase Agreement and First Amended Agreement and informed Plaintiff that it would now be able to complete its performance.

36.     On September 7, 2016, the parties executed a second amendment to the Purchase Agreement ("Second Amended Agreement") that outlined when and how the remaining amount due upon the contract was to be paid and when the equipment would be delivered.

37.     By executing the Second Amended Agreement, Defendant again reaffirmed and ratified its representation that it had the economic capacity to perform its obligations.

38.     Defendant again did not apprise Herkules of its bankruptcy proceeding. Nor did Defendant inform Herkules that if it failed to satisfy its obligations to its creditors under the payment plan by May 16, 2019, it would be forced into liquidation.

39.     On information and belief, at some time after the execution of the Second Amended Agreement, Defendant began wrongfully misusing Plaintiff's trade secrets by attempting to manufacture the equipment itself, with the assistance of its subsidiaries, or with the assistance of third-party competitors of Herkules.

40.     On information and belief, Defendant wrongfully disclosed Plaintiff's trade secrets to its subsidiaries and other third parties in an attempt to secure a manufacturer that could produce the equipment for a cheaper price.

41.     On information and belief, Defendant misused Plaintiff's trade secrets within the United States and wrongfully disclosed Plaintiff's trade secrets to third parties within the United States.

### E. AHMSA Defaults on the Second Amended Agreement

42.   On January 24, 2019, Defendant defaulted on its obligations under the Second Amended Agreement. On information and belief, this default was caused by Defendant's upcoming obligation to pay its creditors approximately 92 million dollars by May 16, 2019 under the Lifting Order.

43.   Defendant was aware that if it were to default on its bankruptcy obligations under the Lifting Order, it would be forced into liquidation under Mexican law.

44.   Defendant was also aware that if it defaulted on its contractual obligations to Herkules, Herkules would be compelled to enforce its contractual rights by filing a separate lawsuit in San Antonio, where Defendant's American subsidiary's headquarters is located. Any potential lawsuit by Herkules would take substantial time to resolve and be costly to Herkules. Moreover, Defendant would not risk liquidation in defending this lawsuit.

45.   In light of these considerations, on information and belief, Defendant made a unilateral, strategic decision to default on its obligations to Herkules in favor of meeting its obligations under the Lifting Order.

46.   At all times, Defendant concealed from Herkules the fact that its performance of its contractual obligations was subordinate to its performance of its obligations under the Lifting Order.

47.   On March 12, 2020, Plaintiff sent a letter to Defendant informing it that if the outstanding amount due upon the contract was not paid by March 31, 2020

Plaintiff would terminate the contract in the manner outlined in the Purchase Agreement. The letter was sent by email and, on March 13, 2020, by international courier.

48.     On March 18, 2020, Defendant refused receipt of the copy of Plaintiff's letter that was sent by international courier.

49.     On April 3, 2020, Defendant responded to Plaintiff's March 12, 2020 letter via email. Defendant, through Patricio Eduardo Villarreal Gonzalez, apologized for the delayed response and stated that Defendant was "trying to get an official arrangement on how to solve this."

50.     On April 9, 2020 Plaintiff responded via email and informed Defendant that it had not yet received any payment or suggested payment schedule from Defendant. Plaintiff informed Defendant that it reserved the right to terminate the agreement due to Defendant's non-performance.

51.     On April 13, 2020 Defendant responded, again via email, and stated that it intended to have a proposed resolution "within the next couple of days."

52.     On April 29, 2020 Plaintiff sent a letter to Defendant informing it that Plaintiff was terminating the agreement. In the letter, Plaintiff explained that pursuant to the terms of the agreement, Defendant's breach entitled Plaintiff to reimbursement for lost profits and certain costs and expenses, including storage fees. Plaintiff included its calculation of the outstanding amount owed, which was $2,248,766.00.

53.     In a good-faith effort to resolve the matter in a manner that avoided additional costs to both parties, Plaintiff offered Defendant a termination agreement in the April 29, 2020 letter. Plaintiff proposed that Defendant would transfer ownership and title of the equipment from payments already made back to Plaintiff. In exchange, Plaintiff would waive its right to seek the reimbursements that it was entitled to receive under the terms of the agreement.

54.     Additionally, Plaintiff informed Defendant in the April 29, 2020 letter that if the termination agreement was not accepted by May 31, 2020, Plaintiff would be compelled to fully enforce its rights to collect the reimbursements it was entitled to by the terms of the Purchase Agreement.

55.     Defendant never responded to Plaintiff's April 29, 2020 letter or communicated any further with Plaintiff.

## V.     CAUSES OF ACTION

## COUNT I – MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §§1831-1839

56.     Plaintiff incorporates all of the allegations described in paragraphs 1-55 as if they were set forth in their entirety herein.

57.     Defendant acquired trade secrets owned by Plaintiff in the course of Plaintiff's performance of the contracts.

58.     Plaintiff's trade secrets were related to a product or service used in, and intended for use in, interstate and foreign commerce.

59.     Defendant misappropriated Plaintiff's trade secrets by acquiring them through misrepresentation, by using them in an unauthorized manner, and by disclosing them to third parties without Plaintiff's knowledge or consent.

60.     At the time of its disclosures, Defendant knew, or had reason to know, that it had acquired the trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

61.     Defendant had a contractual duty to maintain the secrecy of Plaintiff's trade secrets.

62.     Defendant's disclosures, and other acts in furtherance of its misappropriations, were committed in the United States.

63.     Defendant's disclosure of Plaintiff's trade secrets was willful and malicious.

64.     Defendant's misappropriations have caused damage to Plaintiff and to Plaintiff's valuable intellectual property. Plaintiff seeks damages for any loss caused by Defendant's disclosure and for any unjust enrichment caused by the misappropriation of Plaintiff's trade secrets.

65.     Plaintiff seeks exemplary damages for Defendant's willful and malicious disclosure of its trade secrets.

66.     Plaintiff seeks an injunctive order prohibiting Defendant from making any further disclosures of Plaintiff's trade secrets.

67.     Plaintiff seeks a reasonable attorney's fee and other litigation costs reasonably incurred.

**COUNT II – BREACH OF CONTRACT**

68.    Plaintiff incorporates all of the allegations described above in Paragraphs 1-67 as if they were set forth in their entirety herein.

69.    The Purchase Agreement, First Amended Agreement, and Second Amended Agreement were valid contracts between Plaintiff and Defendant.

70.    Plaintiff performed all of its obligations according to the terms of the contracts.

71.    Defendant's actions, detailed above, constituted breaches of the contracts.

72.    Plaintiff has been damaged by Defendant's actions in violation of the contracts and seeks compensatory damages in an amount to be determined by a trier of fact as well as its attorney's fees incurred in bringing and prosecuting this case.

**COUNT III – NEGLIGENT MISREPRESENTATION**

73.    Plaintiff incorporates all of the allegations described above in paragraphs 1-72 as if they were set forth in their entirety herein.

74.    Defendant provided information in the course of its business, or in a transaction in which it had a pecuniary interest, regarding Defendant's economic capacity to enter into, and willingness to perform, the Purchase Agreement and subsequent amendments.

75.    Specifically, Defendant represented to Plaintiff on August 7, 2014 that it had "sufficient legal and economical capacity" to enter into and perform its obligations under the Purchase Agreement.

76.     Defendant represented to Plaintiff on November 10, 2014 that it had "sufficient legal and economic capacity" to enter into and perform the First Amended Agreement.

77.     Defendant represented to Plaintiff on September 7, 2016 that it had "sufficient legal and economical capacity" to enter into and perform the Second Amended Agreement.

78.     The information supplied was false.

79.     Specifically, Defendant did not communicate the existence of the ongoing bankruptcy proceeding, which inhibited its economic capacity to perform its obligations under the Purchase Agreement and subsequent amendments.

80.     Further, Defendant did not communicate the details of the payment plan, and in particular the existence of the May 16, 2019 deadline by which it needed to satisfy its obligations under the payment plan or be forced into liquidation, when it executed the Second Amended Agreement.

81.     Defendant did not exercise reasonable care or competence in obtaining or communicating the information to Plaintiff.

82.     Plaintiff justifiably relied on the information provided by Defendant in entering into and performing under the Purchase Agreement and subsequent amendments.

83.     Plaintiff has suffered damages that were proximately caused by its reliance on the false information provided by Defendant and seeks compensatory damages for its injury in an amount to be determined by a trier of fact.

**COUNT IV – FRAUD IN THE INDUCEMENT**

84.     Plaintiff incorporates all of the allegations described in paragraphs 1-84 as if they were set forth in their entirety herein.

85.     On August 7, 2014 Defendant represented to Plaintiff that it had "sufficient legal and economical capacity to enter into" the Purchase Agreement.

86.     On November 10, 2014, Defendant represented to Plaintiff that it had "sufficient legal and economical capacity to enter into" the First Amended Agreement.

87.     On September 7, 2016, Defendant represented to Plaintiff that it had "sufficient legal and economical capacity to enter into" the Second Amended Agreement.

88.     These representations were false, and Defendant knew that they were false when made, or made the representations recklessly without any knowledge of their truth and as positive assertions.

89.     Specifically, Defendant knew at the time that it entered into the Purchase Agreement that it was undergoing bankruptcy proceedings that could affect its economic capacity to perform its obligations under the Purchase Agreement.

90.     Defendant knew at the time that it entered into the First Amended Agreement that it was undergoing bankruptcy proceedings that could affect its economic capacity to perform its obligations under the First Amended Agreement.

91.     Defendant knew at the time that it entered into the Second Amended Agreement that it was obligated to satisfy its obligations under the payment plan by May

16, 2019, or be forced into liquidation, which could affect its economic capacity to perform its obligations under the Second Amended Agreement.

92.    Defendant intended Plaintiff to rely on its false statements and act upon them by performing Plaintiff's obligations under the Purchase Agreement and subsequent amendments.

93.    Plaintiff justifiably relied on the information provided by Defendant in entering into and performing under the Purchase Agreement and subsequent amendments.

94.    Plaintiff has suffered injury and damage from Defendant's fraud and seeks compensatory damages for its injuries in an amount to be determined by the trier of fact.

## VI.    PRAYER

WHEREFORE, Plaintiff prays that upon a final hearing or trial, Plaintiff be awarded judgment against Defendant for the following:

(a) Compensatory damages;

(b) Exemplary damages

(c) Reasonable attorneys' fees and costs;

(d) Prejudgment and post-judgment interest;

(e) Injunctive relief; and

(f) Such other general relief to which Plaintiff may be justly entitled.

DATED:  October 2, 2020.

Respectfully submitted,

*/s/ Elizabeth K. Stepp*
Elizabeth K. Stepp
Texas Bar No. 00788467
eks@federal-lawyer.com
Nick Oberheiden
NY Reg. No. 4619011
nick@federal-lawyer.com
**OBERHEIDEN P.C.**
5728 LBJ Freeway, Suite 250
Dallas, Texas 75240
(214) 334-7648 (Telephone)
(972) 559-3365 (Facsimile)
**ATTORNEYS FOR PLAINTIFF**